## No. 25259

**Service Oil Co. v. Stanley Rhodus, William Clayton, Dr. James Mezen, Kenneth Wetterstrom, and Del Armstrong, as Members of the Board of Adjustment and Appeals of Englewood, Colorado, and William F. Brokate, Chief Building Inspector, Englewood, Colorado**

(500 P.2d 807)

Decided September 5, 1972.

336

Simon, Eason, Hoyt & Malone, P.C., Ireland, Stapleton, Pryor & Holmes, P.C., Richard L. Eason, for petitioner-appellee.

Bernard V. Berardini, City Attorney, George B. Lee,

Assistant, for respondents-appellants.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

This is an appeal by the City of Englewood, the Board of Adjustment and Appeals (and the members individually), and the Chief Building Inspector, from a decision of the District Court of Arapahoe County reversing the Board's denial of a variance (relating to a time requirement) to Service Oil Co. (Oil Co.) to reconstruct a service station at the intersection of West Hampden Avenue and South Bannock Street. The service station had been substantially destroyed by an explosion and fire on May 28, 1969. Oil Co. concedes that it made no effort to obtain a permit to rebuild the service station until after it had settled its claim for insurance in December 1969, more than 180 days after the calamity.

The findings of fact by the Board, which are not seriously contested, show that the service station was constructed in 1944 and was then zoned for use as a service station until 1955, at which time it was rezoned to B-1; that applicant acquired the property in 1957 and the property continued to be used as a service station, except for a period of about one month, until the fire in May 1969; that the service station was a lawful nonconforming use in the B-1 district; that "no evidence whatever" was presented by Oil Co. to show that it "cannot find a reasonable return of service, use or income compared to adjacent conforming property in the same district" if the property is used in conformance with B-1, Business District, zoning regulations; "that a variance would in fact, weaken the general property of the zoning ordinance and regulations prescribed in B-1, Business District"; that should the variance requested be authorized, "the essential character of the B-1, Business District, . . . would be altered."

The trial court, in reversing the Board, specifically found: ". . . that the findings of fact and conclusions of the Board of

Adjustment and Appeals support its decision; albeit, its conclusions are in the negative. The burden was on the petitioner to establish that the conditions under which a variance might be granted were present, as required by Section 22.2-6 of Ordinance No. 26, series of 1963. This the petitioner failed to do.

"However, the amended complaint filed by petitioner challenges the validity of Section 22.6-8 of the Comprehensive Zoning Ordinance of the City of Englewood, 1963. That section provides:

'Sec. 22.6-8 Restoration. Any building in which a Nonconforming Use is housed or any Non-conforming Structure which has been damaged by fire or other causes may be restored provided such work is commenced within one hundred eighty (180) days of such calamity. If such restoration is not commenced within said one hundred eighty (180) days, any use of the land thereafter shall be in conformity with the standards and requirements established by this Ordinance or any amendments hereto for the Zone District in which such land is located.'

"The Court finds that under the express language of *City and County of Denver v. Denver Buick,* 141 Colorado 121, [347 P.2d 919], both in the principal and concurring opinions, such provision is unenforcible."

As will be explained in part II of this opinion, we think that the *City and County of Denver v. Denver Buick, supra,* must be overruled insofar as it requires a specific charter authorization to the Council in order for it to promulgate terms and conditions for the termination of nonconforming uses. Comprehensive zoning contemplates the existence of nonconforming uses and, to ultimately and effectively accomplish the end sought to be accomplished, it is inherent that reasonable means must be afforded to terminate nonconforming uses.

## I. Standing

A question has been raised as to the standing of the

City to raise the constitutional issue because of an obvious, inadvertent omission of the City in the title of its Notice of Appeal, although it was a signature party to the notice. Without dwelling on the arguments pro and con, we conclude that the real contest at all times has been between the Oil Company and the City of Englewood, a municipal corporation, rather than the agents of the City, and that the only issue is and has been one of law as to the constitutionality of Section 22.6-8 of the comprehensive zoning ordinance of the City. Under these circumstances, we elect to suspend the strict requirements of C.A.R. 3 and proceed to a determination of the controversy on the merits. C.A.R. 2.

## II. Denver Buick

As noted, the trial court held that § 22.6-8 was "unenforcible" under the terms of *Denver Buick.* Because of this holding, Oil Co. states:

"Consequently, the issue presented by the instant appeal is whether the people of the City of Englewood, by and through the City Charter, granted to City Council the power which it purported to exercise in the enactment of Section 22.6-8."

In *Denver Buick* this court invalidated a Denver ordinance which it characterized as:

". . . *impos[ing] onerous and unreasonable conditions and terms* [on the continuance of a non-conforming use] *and describ[ing] numerous events and means by which the . . . use may be terminated . . . ." (Emphasis in original text.)*

Section 617 of the Denver Zoning Ordinance relates to nonconforming uses, their continuance and the termination thereof.

In the majority opinion in *Denver Buick,* which invalidated the provisions of Section 617, it was stated:

"In the first place, the charter of the City and County of Denver, which was amended in 1923 to include therein Sec. 219-A authorizing the city council to pass zoning laws, confers none of the powers upon the city council which it

purported to exercise with relation to non-conforming uses as set forth in Section 617-1 of the ordinance.[1] The charter provision, which certainly defines the limits of the Council's authority within that area not controlled by constitutional provision, reads as follows:

\* \* \* \*

"Section 2. . . . and within such districts it may *regulate* and *restrict* the erection, construction, *reconstruction, alteration, repair or use of buildings, structures or land* . . . . (Emphasis added.)

"Section 3. Purposes in View. Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; . . . . Such regulation shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the City and County of Denver."

The majority opinion stated that the three sections of the charter set out above and in the footnote "define[s] the limits of Council's authority within the area not controlled by constitutional provision."

The majority of the court then concludes that Section 617 attempts to legislate many things not within the purview of the charter, writing:

". . . Certainly the people have never expressed any intention by implication or otherwise that the City Council should have power to impose the drastic regulations upon owners of property theretofore used for lawful purposes, requiring them to make reports, to submit to annual questionnaires, to record certificates which garble and confuse their titles to real estate, to lose their rights to lawfully use real estate by

1. Section 617-1 is a grant of power to regulate the height and size of buildings and the percentage of the lot that may be occupied, the size of yards, population density and the types of uses. Section 2 authorizes the Council to divide the City and County of Denver into districts in order to carry out the purposes of the amendment.

short time vacancies or short time presumptive abandonment, *or to lose such rights by reason of unfortunate disasters such as fire, wind, insurrection* or inability to procure tenants for a period of one year, etc., all without regard to depressions, panics, or other unforeseen causes over which the property owner has no control . . . ." (Emphasis added.)

██ It thus appears that this court did not invalidate the Denver ordinance on the basis of its *unreasonableness,* but solely upon the ground that the charter did not delegate authority to the Council to legislate on the subject of termination of nonconforming uses. It is with this basic concept that we disagree.

Before leaving *Denver Buick,* the italicized language in Section 617-2 should be noted. The Denver Charter granted Council the power to *regulate and restrict reconstruction, alteration, repair or use of buildings.* This delegation of authority alone would seem to be enough to sustain reasonable restrictions on the repair or reconstruction and use of buildings wholly or substantially destroyed in order to effect the purposes of Section 1 of the Charter.

██ To the extent that the specific delegation of power may have been deficient, the rule is that in the interpretation of a municipal charter the municipality, in addition to those expressly granted, has powers necessarily implied in order to carry out the granted powers. *City of Central v. Axton,* 150 Colo. 414, 373 P.2d 300; *City of Golden v. Ford,* 141 Colo. 472, 348 P.2d 951. The power to zone cannot be effective without the power to ultimately, under reasonable conditions, terminate that which does not conform.

III. Power of City

Oil Co. asserts that:

"The Charter of the City of Englewood does not confer upon the city council the powers which it purported to exercise with relation to nonconforming uses as set forth in Section 22.6-8."

In support of this contention the petitioner-appellee argues, in effect, that if the City has the power to act to terminate nonconforming uses it must find it in C.R.S. 1963,

139-60-1, *et seq.* As we understand the argument it is based on the fact that there are several references in the Charter to "the statutes of the State of Colorado" and to "general law." We do not regard this as a valid argument and will demonstrate its fallacy.

 Article XX, Section 6, Constitution of Colorado, grants home rule cities every power possessed by the General Assembly as to local and municipal matters, unless restricted by the terms of its Charter. *Fishel v. Denver,* 106 Colo. 576, 108 P.2d 236. *See also Vela v. People,* 174 Colo. 465, 484 P.2d 1204. We have held that zoning is a matter of local and municipal concern. *Roosevelt v. City of Englewood,* 176 Colo. 576, 492 P.2d 65.

In Article I of the Charter of the City of Englewood, the City vested its legislative power in the Council (Section 2) and in Section 3 gave it

". . . all powers, functions, rights and privileges in the operation of the municipality, except those . . . *expressly forbidden to Home Rule municipal corporations and cities by the constitution or the statutes of the State of Colorado.*" (Emphasis added.)

Oil Co. argues that Section 3, above, is superfluous, "because it basically repeats the thrust of Section 6, Article XX." It is further contended that Article III, Section 30 of the Charter prevails "over the general and all-inclusive statement contained in Section 3 of Article I, for the reason that the issue herein is the validity of a legislative act." Section 3, as underscored, denies the City only powers "expressly forbidden" by the statutes, and this, of course, would only apply to situations where the legislation was of statewide concern. *Vela v. The People, supra.*

Article III deals specifically with the *Legislative Body.* It creates the council, provides for the organization, staffing and procedures of the Council and grants certain powers. Section 30:

"Powers — Council shall have all municipal legislative powers as conferred by general law, except as provided by this Charter and except those which may be exercised by the

people through direct legislation. The Council shall have the power and authority, within constitutional limitations, to delegate by ordinance to Boards and Commissions such functions, powers or authority herein conferred upon the City as the Council shall deem proper and advisable within its discretion."

In its brief the Oil Co. argues specifically that C.R.S. 139-60-1, *et seq.*, does not grant the power to the City which appears in Section 22.6-8:

"Thus, the Englewood City Council is granted such power in the conduct of the legislative affairs of the City as are conferred by general law. The general law of the State of Colorado as it relates to the extent of municipal power in the exercise of the zoning function is set forth in Article 60 of Chapter 139, Colorado Revised Statutes, 1963. Comparison of the language of C.R.S. 1963, Sections 139-60-1 through 3, demonstrates that it is virtually identical with the language contained in Sections 1 through 3 of the Charter of the City and County of Denver cited and reviewed by the Court in *Denver Buick, supra,* (See pages 136 and 137 of the Court's Opinion) . . . .

"From comparison of the statutory language with the language of the Denver City Charter at issue in *Denver Buick, supra,* it is readily apparent that the City of Englewood can claim no further or additional powers in the area of restriction and regulation of nonconforming uses than that claimed by the City of Denver in 1959."

If we were to accept Oil Co.'s arguments and adhere to *Denver Buick,* it would make no difference whether the power to zone emanated from the Charter or from the statute. In either event the product of the exercise of that power would be unconstitutional. So far as the question of whether the statute or the Charter prevails, that issue was disposed of in *Roosevelt v. Englewood, supra,* when it was recognized that zoning was a local and municipal matter and that Article XX, Section 6, "confers on home rule cities every power possessed by the General Assembly in granting charters generally." *See also Vela v. People, supra.*

■ The General Assembly has power to legislate zoning regulations applicable to *statutory cities.* Where, however, the Charter of a *home rule city* exercises the power delegated to it by Article XX, Section 6, as to matters of purely local concern, the legislature has no power. This being true, the only remaining argument relates to the question of *reasonableness.*

## IV. Reasonableness

Oil Co., as a final argument, contends that the action of the Board in refusing to grant a variance and issue a building permit "acted arbitrarily, and without justifiable reason so far as" the petitioner-appellee was concerned.

Section 60 of the Charter delineates the powers and duties of the Board. It reads in part:

". . . The Board shall have power to hear and determine appeals from refusal of building permits: make special exceptions to the terms of the zoning regulations in harmony with their general purpose and intent; authorize variances from the strict application of regulations in such situations and *subject to such limitations as may be set by ordinance.* The findings and decisions of the Board shall be final, subject only to judicial review." (Emphasis added.)

Section 22.2-6(c) of the Comprehensive Zoning Ordinance enumerates the conditions which must be met as a condition to the granting of a variance. It provides:

"(c) In the matter of granting variances, the Board shall first find that all of the following conditions are present:

(1) That the variance will do substantial justice to all and not to just the particular applicant for the variance.

(2) That the plight of the owner of the property for which the variance is sought is due to unique circumstances existing on the property, not created by the owner or owners and not due to general conditions in the District in which the property is located.

(3) That the development or use of the property if held strictly to the zoning standards of the District in which it is located, cannot yield a reasonable return in service, use, or income compared to adjacent conforming property in the

same District.

(4) That the variance, if authorized, will neither weaken the general purpose of this Ordinance nor the regulations prescribed for the District in which the property is located. (5) That the variance, if authorized, will not alter the essential character of the District in which the property is located."

The Board made specific findings that none of the five conditions existed. There was a complete failure on the part of Oil Co. to show that it was entitled to the variance requested. Unless all of the conditions were answered affirmatively, the Board did not have the power to grant the variance under the terms of the ordinance. Oil Co., relying on *Denver Buick*, contends that the ordinance is invalid because, "council does not have the power to impose drastic regulations upon the owners of property theretofore used for lawful purposes resulting in (the) loss of such rights by reason of an unfortunate disaster, such as fire, wind, etc., all without regard to causes over which the property owners have no control . . . ."

If *Denver Buick* were to stand, the argument of Oil Co. would be valid. However, the above quotation from *Denver Buick* is specifically disapproved.

*Denver Buick* suggests that it is unconstitutional to terminate a nonconforming use that has been destroyed or abandoned through no fault of the owner. This is contrary to the great weight of authority and misconstrues the real meaning of nonconforming use.

In *Euclid v. Ambler Realty*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, the United States Supreme Court acknowledged that zoning, since it restricts an owner's right to use his property, constitutes a partial taking. Zoning is constitutionally permissible, however, so long as it is *reasonable*. It is in this context that nonconforming uses arise. If a property owner has invested money in improvements in order to put his property to a particular use, which is lawful at that time, and if that use is subsequently outlawed by a zoning ordinance, he loses not only the potential use but also the

value of his investment. To impose this additional loss upon him is unreasonable, and therefore he is entitled to continue to use his property as he did before. On the other hand, if the improvements are destroyed or abandoned, he has lost the value of his investment independently of the ordinance and there is no reason why his relationship to the zoning ordinance should be any different from that of his neighbor whose property was unimproved. As stated by *Rathkopf:*

"[T]he constitutional protection afforded the owner of property on which a non-conforming use exists, exists only in order to permit the continuance of the use *to the extent necessary to safeguard the investment of the property owner.*" *2 A. Rathkopf, The Law of Zoning and Planning,* 61-1 (Emphasis added.)

The treatises on zoning uniformly agree that nonconforming uses may be lost for a variety of reasons, including abandonment, destruction, and amortization. *2 A. Rathkopf,* 61-1, *supra;* 1 *R. Anderson, American Law of Zoning* 6.58; *2 E. Yokley, Zoning Law and Practice* 16-13.

If the owner of a nonconforming use suffers the destruction of his improvements, he becomes the owner of unimproved property. The unimproved property may be restricted as to use without a denial of due process. *Euclid v. Ambler, supra;* 2 *A. Rathkopf* 61-14, *et seq.;* 1 *R. Anderson, American Law of Zoning,* 6.55; 2 *E. Yokley* 16-12.

The effect of the fire which substantially destroyed the service station was to sever the improvements from the real estate. Had the Oil Co. been denied a building permit for a filling station on unimproved property, no one could contend that it was unreasonable or that it was a denial of due process. The ordinance in question did not deny the right to rebuild. Had Oil Co. been diligent and sought a building permit within 180 days, it could have continued its nonconforming use of the property. The Englewood ordinance requires both destruction and abandonment. This court has upheld an ordinance which terminated a nonconforming use where there was an abandonment for a period of one year. *Beszedes v. Board,* 116 Colo. 123, 178 P.2d 950.

 Although this court has not had occasion to pass upon the reasonableness of an ordinance terminating a nonconforming use after destruction and "abandonment" for 180 days, we conclude that under the circumstances here that such a provision is valid. While we think that an intent to abandon a nonconforming use is required, there can be no firm and fast rule as to what constitutes sufficient evidence of abandonment. Each case necessarily must depend upon its own facts. While destruction of the premises by fire, flood, hurricane and other natural forces does not show an intent to abandon the nonconforming use of a nonconforming structure, such destruction, coupled with a failure to take reasonably prompt action to rebuild, may be sufficient to manifest such an intent. 2 *A. Rathkopf*, 61-14.

In *State ex rel Covenant Harbor Bible Camp v. Steinke*, 7 Wis.2d 275, 96 N.W.2d 356, the court stated:

". . . Evidently courts have considered that where a nonconforming use has been carried on in a building which has been accidentally destroyed in large measure, it is not unreasonable to compel the owner to conform to zoning requirements thereafter. The investment in an improvement which may not be readily adaptable to a conforming use has been taken away from him by the accident and not by the ordinance. With the improvement substantially destroyed, the land on which it is located will presumably have approximately as much value for use in conformity with the ordinance as otherwise . . . ."

The termination provision under consideration here, in order to be valid, must be reasonable and a justifiable exercise of the police power. Our review of decisions from other jurisdictions indicates that many ordinances prohibit the repair or reconstruction of a nonconforming building which has been damaged by fire or other causes, not intended by the owner, to the extent of more than 50% of the building or its value. These have been held to be valid. Here the building was substantially destroyed — although the ordinance does not contain a percentage provision. Since in the instant case the investment value of the nonconforming use

has been lost to the owner through accident and not through action on the part of the municipality, and since the ordinance allows the owner a reasonable period of time within which to begin to rebuild the destroyed property, it is a reasonable and valid ordinance. One hundred eighty days appears to us to be a reasonable time within which to apply for a permit to rebuild the structure.

 Oil Co. attempts to justify its failure to comply with the 180-day requirement to commence restoration upon its inability to settle its claim with the insurance company within that period of time. It made no showing at the hearing before the Board that without the insurance proceeds it could not finance the restoration of its building. There was no testimony of hardship. Its main excuse, as we read the record, was that it was not aware of the ordinance. Such lack of knowledge does not constitute hardship nor is it a reasonable excuse for inaction under the circumstances of this case. It is evidence of abandonment.

In addition to the Board's finding that none of the ordinance requirements existed for granting a variance to extend the 180-day period, the uncontradicted evidence of the City showed that the service station, located as it was at a busy intersection, created a fire hazard and was a source of increased traffic congestion. These all relate to the public health, safety and welfare. Under all of the circumstances of this case, it appears that the ordinance under attack here is valid and its application to the Oil Co. was reasonable.

The judgment of the trial court is reversed and cause remanded with directions to enter judgment for respondent-appellants.

MR. CHIEF JUSTICE PRINGLE specially concurs.

MR. JUSTICE ERICKSON concurs in the result.

MR. JUSTICE DAY and MR. JUSTICE GROVES not participating.

MR. CHIEF JUSTICE PRINGLE specially concurring:

I concur in the majority opinion. I do so because, in my view, the Englewood comprehensive zoning ordinance pro-

vides a reasonable and adequate means for relief from the harshness which could result from the strict termination of a non-conforming use by operation of the ordinance.

I agree with the majority opinion that the petitioner failed to meet the requirements necessary to obtain the relief from the termination of the non-conforming use as provided by the ordinance.